# THE LAW OFFICE OF JEFF CHABROWE

521 Fifth Avenue, 17th Floor New York, NY  10175 | Tel. 917.529.3921| F 914.462.3637

October 4, 2024

Hon. John G. Koeltl
District Judge
Southern District of New York
Daniel Patrick Moynihan United States Courthouse
Courtroom 14A
500 Pearl Street
New York, NY 10007-1312

      Re:  *USA v. Mohsin Suhan*, Case No. 1:24-cr-00109-JGK-4
          <u>Renewed Bail Application</u> for Defendant Mohsin Suhan

Dear Judge Koeltl:

     I represent Defendant Mohsin Suhan in the above matter. I ask this Court to reconsider its June 25, 2024 decision denying bail for Mr. Suhan. I append a transcript of the June 25, 2024 hearing as Exhibit A. We have new evidence directly addressing one of primary issues identified by the Court as precluding bail. In its denial the Court assumed – materially – that Mr. Suhan had significant financial resources which could only have come from drug dealing and which enabled him to flee. This assumption is inaccurate. We thus renew our request.

     A detention order may be reopened where "information exists that was not known to the movant at the time of the hearing and that has a material bearing on the issue whether there are conditions of release that will reasonably assure the appearance of such person as required and the safety of any other person and the community." 18 U.S.C. § 3142(f); see also *United States v. Rodriguez*, No. 15-MJ-02956, 2015 U.S. Dist. LEXIS 146075, 2015 WL 6503861, at *1 (S.D.N.Y. Oct. 26, 2015) ("[T]he hearing can be reopened if the court finds that information exists that was not known to the defendant at the time of the hearing and that has a material bearing on the issue that was decided."). Whether to reopen is left to the discretion of the district court. *United States v Zhe Zhang*, 55 F.4th 141, 148 (2d Cir 2022).

     In addition to its express statutory authority, a court may "'also revisit its own bail decisions as an exercise of its inherent authority, even if the defendant's proffered new evidence does not meet the statutory standard for reopening the decision.'" *United States v Shu Jun Zhen*, 2024 US Dist LEXIS 79038, at *8 (EDNY Apr. 30, 2024, No. 24-MJ-305), quoting *United States v. Kwok*, No. 23-CR-118-1 (AT), 2024 U.S. Dist. LEXIS 1828, 2024 WL 54170, at *2 (S.D.N.Y. Jan. 4, 2024).

     First, the court must determine the new evidence has a material bearing on the issue. *Zhe Zhang, supra*, 2022 U.S. Dist. LEXIS 221906, 2022 WL 17420740, at *1. Information is material when it was relied on by the court in its initial bail determination. See *United States v Salaman*, 2024 US Dist LEXIS 43876, at *14 (D Conn Mar. 11, 2024, No. 3:22CR76(JAM)). "A

court's prior detention determination is a natural reference point against which to measure the materiality of new information for the purpose of reopening the hearing - that is, revisiting its earlier decision." Id. *United States v. Zhang*, 55 F.4th at 148 41, 147 (2d Cir. 2022). If the added information would not change the court's previous decision, it is not "material." *United States v. Havens*, 487 F. Supp. 2d 335, 339 (W.D.N.Y. 2007). Documentary evidence is of particular weight. *United States v. Jones*, 583 F. Supp. 2d 513 (S.D.N.Y. 2008)

Here, the Court accepted the earlier magistrate ruling that dangerousness was not an issue, but flight was. Tr. 19, 28.[1] The Court inferred Mr. Suhan must have had significant financial resources available to him to afford the Dubai vacation he took with his fiancée, which could only have been garnered from drug activity and which would enable him to flee again should he choose. Tr. 27-28. But newly available evidence undercuts this inference.

To recap briefly, at hearing a general theme was the comparability between Mr. Suhan's circumstances and those of his co-defendant, Arian Ali, who received bail.[2] Both faced the same potential sentence. Tr. 13-14. Evidence of culpability was greater for Ali: he was placed at the actual robbery allegedly texting directions to the gunmen real-time. Tr. 8. It was acknowledged Ali was the government investigatory focus. Id.[3] But this Court still granted Ali bail, noting: 1) strong local family ties, 2) a minimal criminal history with no prior federal cases, and 3) the absence of a "more direct connection" between Ali and the firearms. The Court crafted pre-trial conditions it believed adequately secured Mr. Ali's presence: a $200,000 bond, restricted travel and contact, drug testing and mental health supervision, and home incarceration with his mother as third-party custodian. It upheld that order on the government's appeal.

The evidence of Mr. Suhan's involvement was weaker. Mr. Suhan was not present during the offense. He did not have or discharge any weapon. The allegation Mr. Suhan organized the gunmen rests completely on double hearsay – statements by another conspirator to a cooperating witness, and thence to the government. Tr. 8-9, 16. <u>No other firearm evidence exists.</u> The only evidence of any potential involvement consists of pings off a Bronx cellular tower and later off of cellular towers several miles from the warehouse, from a cell phone believed to belong to Mr. Suhan. Id. No content of any calls or texts exist.

The government relied heavily on Mr. Suhan's travel to Dubai, with his fiancée, on March 30, 2024, as evidence of flight risk. Tr. 28-29. They note he bought a one-way ticket and suggest he did so because his ostensible role had just been made public at a pre-trial conference. But this trip had been planned well before that conference. Mr. Suhan and his girlfriend had been invited to a wedding, and he wanted to propose to her during this trip. The defense presented contemporaneous texts confirming these facts.

Of great concern to this Court, however, was how this trip was financed. It stated on June 25:

---

[1] "Tr" references are to the June 25, 2024 hearing transcript, Exhibit A.

[2] Case 1:24-cr-00109-JGK-1m Doc. 33-1, filed 03/26/24, pp. 25-31.

[3] The government also submitted evidence Mr. Ali posted he wanted to continue narcotics activity, and that he had done so from inside Rikers previously.

As Magistrate Judge Willis adverted to, the defendant, with some knowledge of the existence of this case, even though there may have been other reasons, **the defendant had the resources** and left the country for Dubai and Thailand for six weeks while the case was pending. **The defendant had the resources to pay for the tickets**, in addition to pay for the ring, which the defense puts in for the invoice of over $7,000, plus whatever support there is for the alleged proceeds of the robbery, which didn't, in fact, go to fruition, from what I can tell from the evidence, but a conspiracy over time which would have been profitable. So this is the unusual case where not only is there a great incentive to flee, not only is there -- **are there resources to flee**, but there is, at about the time that the case was being brought against other defendants, flight by the defendant. Whether that was solely because of the desire to have an engagement abroad and was wholly uninfluenced by the fact that other alleged co-conspirators were being prosecuted is something that can't be resolved.... But the fact of a flight for six weeks **with resources** is certainly evidence of a risk of flight.

Tr. 28-29 (emphasis added). In other words, it was not just the fact Mr. Suhan had left on a trip to Dubai with his girlfriend that persuaded this Court. The Court acknowledged it could not determine if knowledge of the co-defendants' case motivated the trip or not. Tr. 28. Rather, the Court also believed Mr. Suhan had significant resources to flee. Tr. 28-29.[4] The government conceded it had no idea what motivated Mr. Suhan to return but, with presumably large cash resources available, "the concern here is that if the defendant is released, he still may have access to the same money, the same cash, the same resources to again book a trip and leave the country." Tr. 22. "The concern is that he fled in the first instance, and that he could flee again." Tr. 27.

The defense now presents evidence that virtually every expense involved in this trip was paid for by Mr. Suhan's bank card. Attached are records showing bank account debits for all trip expenses. Mr. Suhan's fiancée, Ms. Soto, recently provided these records to the defense. She could not obtain them previously because Mr. Suhan's phone was in custody, and she did not have the password to his account. She only recently obtained that password. See Exh B.

These records show the flights from JFK to Dubai, from Dubai to Bangkok and Bangkok to JFK (Emirates Air), were paid for by bank card. Exh. C. The hotels in Dubai and Bangkok were paid similarly. Exh D. There are three charges for Dubai hotels (March 31 to April 7, 2024, April 7 to April 14, 2024 and April 14 to April 18, 2024. There are four Bangkok hotel charges (April 18 to 25, April 26 to May 3). Id.

The bank card account also shows miscellaneous daily expenses - for cabs, delis, phone credits, coffee and sandwich shops, grocery stores, ice cream parlors, the Cheesecake Factory, a Nike outlet, a beauty supply store, men's clothing store, pharmacies, recreation centers, guide services, food deliveries, hotel restaurants, markets, perfume shop, etc. These are collected in Exh E. The miscellaneous expenses are incurred daily from April 1 to May 12, 2024. They were paid by bank card.

---

[4] The Court considered the photos on Mr. Suhan's phone submitted by the government. It noted the magistrate's prior determination that at least one of those photos did not "impress" him. Tr. 18.

3

The air fares totaled $3,434.54. The hotels over the 43 days totaled $5,490.13, or about $127 a night. Miscellaneous travel charges totaled $9064.99, or about $210 daily (including food, transport, shopping, etc.). The trip costs from start to finish thus totaled $17,989.66.

At the same time, deposits were made into this bank account, from car payments received from Mr. Suhan's Turo car rental business. Those deposits totaled $14,985.

Mr. Suhan's trip to Dubai with his fiancée was not financed by illicit proceeds. It was paid for from his bank account, which contained his earnings from his car rental business and his salary as a CDPAP provider to his grandmother. There is absolutely no basis to conclude Mr. Suhan must have been involved in drug dealing to take such an elaborate trip and therefore still had resources to flee. He did not use cash. He used his bank card for virtually all travel expenses. And his bank account was based on his earnings.

Nor was the trip particularly elaborate to begin with. Vacation costs in Dubai are comparable to or less than those of Europe; a trip there can be as expensive or as cheap as one makes it. The couple's miscellaneous daily costs included sandwich shops, delis  - not expensive restaurants. Mr. Suhan's hotel costs in Dubai averaged from $150-160 per night. His Bangkok hotel ranged from $60-175 per night, averaging $124 a night. Mid-range hotels in Europe average $200-300 a night.[5] In New York, the average nightly hotel cost for the first three months of 2024 was $230 a night.[6]

Mr. Suhan had been working and saving steadily for months before his arrest. He lived and ate at home. He had a steady stream of income. During his trip, a total of $14,485.01 was deposited into the bank account, payments from the car rental business. (By way of correction, the defense submitted at the June 25 bail hearing a document it believed was a $7,000 receipt for Ms. Soto's engagement ring.  It was not a receipt; it was an appraisal. Mr. Suhan paid $2500 in cash for the ring.)

The photos submitted by the government could not have been a "stash of cash" used to finance his vacation because he would not have been able to fly with such a large amount of cash without declaring it. Had he taken this amount and not declared it, the cash could have been confiscated.[7]

This Court decided to deny bail in part because it concluded Mr. Suhan had resources to flee. This factor may not have been dispositive, but it certainly was material. "Information is material when it was relied on by the court in its initial bail determination." *United States v Salaman,* 2024 US Dist LEXIS 43876, at *14.

---

[5] https://www.viqal.com/blog/hotel-room-prices-around-the-world#:~:text=Major%20Cities%20(e.g.%2C%20London%2C%20Paris):%20*%20Budget,Luxury%20Hotels:%20$400%20and%20upwards%20per%20night.

[6] https://www.nytimes.com/2024/05/25/nyregion/hotels-prices-migrants-nyc.html

[7] https://www.usa.gov/travel-money#:~:text=If%20you%20fail%20to%20report,to%2010%20years%20of%20imprisonment

4

When this factor is removed, Mr. Suhan's case for bail becomes even stronger. There still exists the fact Mr. Suhan left for Dubai, but also the fact he voluntarily returned. The government provided no reasonable explanation for why an individual would flee prosecution but then return. As the government stated at Mr. Suhan's May 14, 2024 bail hearing, "I couldn't tell the Court why he reversed course and came back." And the defense provided at the June 25 hearing documentary evidence showing alternative reasons for the trip that predated the onset of this case. The government never rebutted that evidence. When a defendant rebuts a presumption in bail, the government must then meet its burden of flight risk by a preponderance of the evidence. It has not done so.

The remaining differences between his case and that of Ali are virtually nonexistent; if anything, the evidence inculpating Mr. Suhan is weaker. The Court noted the potential sentences involved gave incentive to flee. But that same incentive existed for Ali, who faces the same potential sentence. We are thus left with the situation where two almost identically situated defendants were treated radically differently – indeed, where one with greater evidence of culpability was treated more leniently than one with less.

The defense amply met the remaining criteria for bail. Mr. Suhan's local family ties are significant. He and his family are Bangladeshi and now all naturalized U.S. citizens. His father, Mr. S Miah, came to the United States from Bangladesh, where he had worked fifteen years on the local government union council. His wife Rahima Begum taught high school in Bangladesh. They are both college-educated. They moved to Queens in 2009. Mr. Miah, his wife, his elderly parents, three children, and some extended family members lived together in a one bedroom apartment. The family moved to upstate New York in 2020 for Mr. Suhan to start college classes. Mr. Suhan is 22 years old; he has an older brother Nabin Marjan who just completed a tour in the U.S. Army. His younger sister, Sanjida Jui, is enrolled as a Biology major at SUNY-Buffalo, studying to become a dentist.

Mr. Suhan was most recently working as the home aide for his ailing grandmother, under the New York Consumer Directed Personal Assistance Program. He also worked for a luxury car rental company, Turo, until his arrest.

Mr. Miah owns the family home in Buffalo, valued at $200,000. He is available as a surety. Mr. Miah now works for Tesla as a production associate and earns about $57,000 yearly. His wife Rahima cannot work; she has been diagnosed with bipolar disorder and cannot keep a job for any length of time. Her condition has worsened since her son's arrest. Mr. Suhan cares for her during the day along with his grandmother. His brother Nabin has just bought a house, valued at about $200,000, and moved out. He is available as a surety.

The entire family maintains close ties with their extended family members still in Queens. The family are deeply religious and attend the Al-Ihsan Jame Masjid mosque in Buffalo several times weekly. Mr. Suhan is engaged to Maria Soto, a New York native now living in Harlem. They have known each other since 2017. Ms. Soto has savings and assets she would also provide for bond.

These are significant, substantial family ties. This is a hard-working, immigrant family who have pulled themselves up by the proverbial bootstrings. Mr. Suhan has been an integral part of this unit. It is unfathomable that he would allow his father, brother, fiancée, and any others to post their homes or other assets only to lose them by his flight. He has cared for his 85 year-old grandmother for years. His mother is mentally ill and her condition worsening. He will not leave them homeless by skipping bail. If Mr. Suhan intended to abscond, he had no reason at all to return to New York on May 12 via JFK airport. But he did, and the government has no reasonable explanation why he did so. Mr. Suhan does not present a flight risk.

The Court agrees Mr. Suhan would present no danger to the community if released. He has virtually no criminal history, except for a 2021 marijuana possession charge. His commitment to his family underscores his reliability. The government inflates Mr. Suhan's role in the offense. They cannot place him as organizing the gunmen or even at the robbery itself with any direct evidence. He cannot be linked to firearms, other than by double hearsay. If this Court found Ali's connection to the guns too "tenuous" to impede bail, it certainly should not impede bail here where the connection is even weaker.

The same pre-trial release conditions ordered for Arian Ali can be imposed on Mr. Suhan. He is even more amenable to third party guardianship since he was already staying at home caring for two ill, older family members. These family members are in extreme duress without Mr. Suhan's presence to care for them. Those conditions will guarantee Mr. Suhan's continued presence.

Finally, this Court may also consider the conditions Mr. Suhan faces at MDC Brooklyn. The horrific conditions there are well-known. Inmates are on constant lockdown. There is severe staff shortage, which affects security, medical services and other issues. Inmate violence is widespread. One judge on the SDNY bench recently granted bail to an elderly defendant expressly to keep him out of MDC custody.[8] He summarized the extensive litany of problems there (reduced staffing, near-perpetual lockdowns, unavailability of medical and psychiatric care, suicide rate, routine drugs and other contraband, squalor in living conditions). Cockroaches, rotting food, and the like abound. Other judges have conducted investigations. Mr. Suhan has already witnessed an inmate bleed out and die literally in front of him. The inmate stabbed to death on June 7, 2024, was in handcuffs and waiting for officers to respond when he died in front of Mr. Suhan. These traumatic conditions are relevant to bail considerations.

Based on all of the above, the defense asks this Court to now grant bail to Mr. Suhan.

Respectfully submitted,

*Jeff Chabrowe*

**JEFFREY CHABROWE, ESQ.**
**LAW OFFICES OF JEFFREY CHABROWE**
521 Fifth Avenue, 17th Floor
New York, NY 10175
(917) 529-3921

---

[8] Order dated 1/4/24, Case 1:22-cr-00303-JMF

6

jeff@chabrowe.com
***Counsel for Mohsin Suhan***

cc:  Andrew Jones, Esq.,
     U.S. Attorney's Office for the
     Southern District of New York
     andrew.jones2@usdoj.gov